**George BENSON et al., Appellants,**

v.

**ELEVEN–TWENTY ST. CHARLES COMPANY et al., Respondents.**

No. 52352.

Supreme Court of Missouri,

Division No. 2.

Nov. 13, 1967.

Motion for Rehearing or to Transfer to Court En Banc Denied Jan. 8, 1968.

Blumenfeld, Kalishman, Marx & Tureen, Richard Marx, Shifrin, Treiman, Schermer & Susman, Louis B. Susman, St. Louis, for plaintiffs-appellants.

R. H. McRoberts, R. H. McRoberts, Jr., St. Louis, for defendant-respondent, Eleven-Twenty St. Charles Co.

Morris J. Levin, St. Louis, for defendants-respondents, M. H. Mandel and Burton Mandel, Bryan, Cave, McPheeters & McRoberts, Levin & Weinhaus, St. Louis, of counsel.

BARRETT, Commissioner.

The individual parties, the Gitts and Bensons as plaintiffs and M. H. Mandel as defendant, are the owners of all the common stock of the corporate defendant Eleven-Twenty St. Charles Company. In this multiple-purpose action the Gitts and Bensons sought to have declared void the election of Mandel and his son, Burton, as directors of the corporate defendant; they also asked for the appointment of a receiver and eventually the dissolution and liquidation of the company. The trial court's findings of fact and conclusions of law were all against the plaintiffs and they have appealed. Both parties assert that jurisdiction is appropriately in this court because the appeal involves the construction of Article 11, § 6 of the Missouri constitution relating to cumulative voting for corporate directors (Shapiro v. Tropicana Lanes, Inc., Mo., 371 S.W.2d 237), and as to liquidation a company worth more than one million dollars.

In very brief summary the facts are that in 1947 Mandel and his then friends, Dr. Gitt and George Benson, formed Eleven-Twenty Corporation with a capitalization of 10 shares of stock, 5 of which were issued to Mandel, 2½ to Dr. Gitt and 2½ to Benson. The Gitts have transferred ¼ share to their minor son, David, and ¼ share to their daughter, Barbara Ann. While Gitt and Benson claim that stock ownership was to be "equal," that is, one-half to Mandel and one-half to Gitt and Benson, Mandel insisted on personal "control" and before the stock certificates were delivered to Gitt and Benson they entered into separate "Stockholders' Agreements" with Mandel. These agreements provided that they could not sell their shares of stock without Mandel's consent and in the event of a proposed sale Mandel had the first refusal to purchase at book value (which was defined and computed) and upon the deaths of Benson and Gitt he had "the absolute right to purchase" at book value. Indicative of Mandel's insistence on "control" is the preamble to these documents: "Whereas, First Party (Mandel) *intends at all times* in view of the fact that he has discovered and promoted said deal, *to retain absolute control of said corporation and said property.*"

The sole purpose of forming the corporation was to purchase a "multi-story parking garage at 1120 St. Charles Street," leased to Scruggs-Vandervoort-Barney, first at $25,000.00 a year and later at $40,000.00 annually for a period of years. The purchase of this property from the Langenberg family for $175,000.00 was accomplished in this manner: The capitalization of the company, $1000.00, the only cash outlay by the three promoters, was advanced $500.00 by Mandel, $250.00 by Gitt and $250.00 by Benson. The balance of the purchase price, $24,000.00, secured by a sec-

ond deed of trust was borrowed, $9750.00 from Gitt, $9750.00 from Benson and $4500.00 from Mandel, and $150,000.00 secured by a first deed of trust from the Prudential Insurance Company. It is not necessary to detail the financial record and dealings of this company, it is sufficient to say that in its early years and up to June 1956, on their cash outlays of $250.00 and $500.00 Benson and Gitt received dividends of $11,800.00 each and Mandel $23,600.00 and in addition Gitt and Benson were paid salaries in excess of $40,000.00.

In 1949, at Mandel's instigation, the company purchased the Berthold property for $85,000.00. The down payment of $10,000.00 was advanced in loans from the Eleven-Twenty Company to Benson, $5000.00, and Gitt $5000.00. In 1955 this property was sold and the three shareholders divided a gross profit of $172,506.20. Mandel and Gitt reinvested their net profits, $60,000.00 and $30,000.00 in the parent company but Benson refused to reinvest his $30,000.00 share and this was the end of the Benson-Mandel friendship and amicable business relationship. Mandel was of the opinion that Benson had "welshed" or "ratted out" and, thereafter, until Gitt and Mandel fell out, Gitt and Mandel voted together and against Benson on all corporate matters. Finally the Gitt-Mandel association, dating back to boyhood, came to an end and what had once been a pleasant social and business relationship among friends developed into bitter internecine stockholder warfare and finally into reciprocal implacable personal hatred. The result has been that since 1957 no dividends have been paid by the Eleven-Twenty Corporation and, of course, Benson and Gitt have received no sums of money from any of its enterprises. Nevertheless, it should be interpolated, over the years and particularly from the reinvestment of the Berthold profits, control of Associated Garages was acquired and three of its four garages have been sold, one to Sheraton-Jefferson Hotel for $800,000.00 and two others to the "stadium group" for large sums and that company is worth in excess of one million dollars.

This lawsuit was precipitated by the annual meeting of stockholders of the Eleven-Twenty Corporation on February 7, 1964. As of that date Mandel was the record owner of 5 shares of stock, Benson 2½ shares, Dr. Gitt 1 share, Charlotte Gitt 1 share and ¼ share was issued in the names of J. J. Gitt and Charlotte Gitt as trustees for David and ¼ share as trustees for Barbara. Benson and Gitt did not attend the annual stockholders' meeting, instead their two attorneys appeared with proxies from Benson and Gitt and they attempted to cast, cumulatively voting, 7½ votes for each of their nominees for director, Benson and Gitt's lawyer. Mandel ruled, however, that fractional shares could not vote and casting his votes for himself and his son, Burton, elected two directors. Gitt's and Benson's counsel declined to cast their votes, without counting fractional shares, so as to elect one director. Thus is presented the question of whether under Missouri law fractional shares of stock are entitled to vote in the election of corporate directors.

The appellants, the Gitts and Benson, claim that they were entitled through their proxies to vote their fractional shares thereby creating a deadlock in the election of directors and the management of the company. They contend, having thus created, an irreconcilable deadlock in the management of the company, that the court in the exercise of its equity jurisdiction should liquidate the corporation and distribute its assets. Handlan v. Handlan, 360 Mo. 1150, 232 S.W.2d 944. In this connection they contend that Mandel's conduct in managing and controlling the corporation has been oppressive and illegal within the meaning of § 351.485, RSMo 1959, V.A.M.S., that he has violated a fiduciary relationship and for all these reasons there should be a decree of dissolution and liquidation. As indicated, the trial court found all these issues against the plaintiffs and in large measure the findings depend on credibility and while the transcript has been thoroughly considered

deference is due the trial court and it may only be said that his findings are supported, certainly the appellants' claims in these respects do not appear as a matter of law and this court could not confidently make contrary findings of fact. Furthermore, as the parties must tacitly concede, the meritorious and determinative question is whether fractional shares are entitled to vote, if not, there is no deadlock in corporate management and the essence of plaintiffs' claims fail.

In support of their contention that fractional shares are entitled to vote the appellants point to the language of the constitutional and statutory provisions concerning cumulative voting of stock for directors and managers "each shareholder shall have the right to cast as many votes in the aggregate *as shall equal the number of shares held by him*" (Const.Mo. Art. 11, § 6), and *"Each oustanding share* entitled to vote under the provisions of the articles of incorporation *shall be entitled to one vote* on each matter submitted" (RSMo 1959, § 351.245(1)) and urges that "each shareholder" and "shares" in the constitution does not mean "each full share" and plainly admits of and includes "fractional shares." They urge that under the statute and the constitution stock ownership carries three rights, the right to vote, the right to receive dividends and the right to a share of the corporation upon liquidation and that these values may not be destroyed by denial of the right to vote fractional "shares."

Both appellants and respondents rely on § 351.300, RSMo 1959 (Laws Mo.1965, p. 532, amending Chapter 351 extensively but not § 351.300). Insofar as material here that statute provides that:

"*A corporation may*, but shall not be obliged to, *issue a certificate for a fractional share*, and, by action of its board of directors, may issue in lieu thereof scrip or other evidence of ownership which shall entitle the holder to receive a certificate for a full share upon the surrender of such scrip or other evidence of ownership aggregating a full share, *but which shall not, unless otherwise provided, entitle the holder to exercise any voting right*, or to receive dividends thereon or to participate in any of the assets of the corporation in the event of liquidation."

The appellants urge that in adopting this provision the legislature "differentiated" scrip and fractional shares, thereby recognizing "rights" in fractional shares not recognized in "scrip." On the other hand, the respondents point to eleven sections of The General and Business Corporation Law of Missouri (RSMo 1959, § 351.010) and urge that the words "share" or "shares" do not and cannot mean "fractional shares." The bylaws provide that "Each stockholder shall have one (1) vote for each share of stock having voting power, registered in his name on the books of the corporation." The respondents, of course, rely on this provision of the bylaws and what is stated in the texts and annotations as "the rule that fractional shares of stock cannot be voted in the absence of express legislative authorization to that effect." Annotation 98 A.L.R.2d 357, 361; 19 Am.Jur.2d § 636, p. 152; 47 Ky.L.J. 506, 510–511. 5 Fletcher, Cyclopedia Corporations, § 2045.1, p. 208, adds the comment, including a reference to the Missouri statute, that "Under the Model Business Corporation Act a certificate for a fractional share shall, but scrip shall not unless otherwise provided therein, entitle the holder to exercise voting rights." This is a correct reference to the model act (see 1 Model Business Corporation Act Annotated, § 22, p. 373) but the annotator as well as others have erroneously assumed that the General Assembly of Missouri adopted Section 22 of the model act.

As the publishers of the Missouri Annotated Statutes note, 17A V.A.M.S. p. IV, Missouri "modeled" Chapter 351 on the Illinois law and while Illinois in 1957 (32 Smith-Hurd Ill.Supp.Laws of Ill.1957, p. 2192) amended its corporation code and specifically § 157.22 and adopted Section 22 of the model code providing that a frac-

tional share "shall" have the right to vote, the Missouri legislature while revising its code in 1963 adopted in § 351.300 the Illinois statute as it was enacted in 1933 which provided for certificates for fractional shares "but which shall not, unless otherwise provided, entitle the holder to exercise any voting right". 32 Smith-Hurd Ann. Ill.St. pp. 177–178. In view of the dates on which the various statutes were enacted or amended it must be inferred that the Missouri legislature acted advisedly when it adopted the older Illinois statute rather than Section 22 of the model act.

There is no purpose in considering the rationale of this point of view, the only case squarely in point under comparable legislation is Commonwealth ex rel. Cartwright v. Cartwright, 350 Pa. 638, 40 A.2d 30, 155 A.L.R. 1088. All the arguments advanced here were made in that case and rejected and while, as appellants urge, the case is not binding on this court, and its reasoning need not be adopted in toto, what it says as to legislation is peculiarly applicable and persuasive: "The legislature authorized the issue of certificates for fractional shares, but it did not authorize voting based on such shares. It *could* have done so, and it may even have *intended* to do so, but the fact is *it did not* do so." The court concluded by its opinion by saying that the arguments in favor of voting fractional shares should be addressed to the legislature since in specifically providing to the contrary the legislature had acted advisedly.

While not necessarily forceful analogies, Missouri has adopted the view that Article 11, § 6 of the Constitution, and the statutes as well, permit the classification of both common and preferred stock as voting and nonvoting. State ex rel. Frank v. Swanger, 190 Mo. 561, 89 S.W. 872, 2 L.R.A.,N.S., 121; Shapiro v. Tropicana Lanes, Inc., Mo., 371 S.W.2d 237.

For the reasons indicated and upon this record fractional shares may not be voted for director and accordingly the judgment is affirmed.

STOCKARD and PRITCHARD, CC., concur.

PER CURIAM:

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

All of the Judges concur.